**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Fort Lauderdale Division**
**www.flsb.uscourts.gov**

In re:

**DECORATOR INDUSTRIES, INC.,**                          **Case No. 11-37641-BKC-JKO**
                                                          **Chapter 11**

                    **Debtor.**
_____/

**DECLARATION OF WILLIAM A. JOHNSON, PRESIDENT AND CHIEF EXECUTIVE**
**OFFICER, IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

STATE OF FLORIDA                )
                                ) ss:
COUNTY OF BROWARD               )

        I, William A. Johnson, being duly sworn, deposes and says:

        1.      I am the President and Chief Executive Officer of Decorator Industries, Inc. (the "Debtor" or the "Company").

        2.      I have served as Chief Executive Officer of the Company since January 2008, President of the Company since August 2007, and have been an Officer since June 1998.  Prior to becoming President, I served as the Company's Controller, beginning in January 1997.

        3.      The operations of the Company and the actions of its Officers are subject to the direction of the Board of Directors of the Company (the "Board of Directors").  I was appointed to the Board of Directors in 2009.  The other members of the Board of Directors as of October 3, 2011, 2010 (the "Petition Date") are William A. Bassett (Chairman), William C. Dixon,  Terry Murphy and Chris Sansone.

        4.      The Vice President, Chief Financial Officer, Treasurer and Secretary of the Company as of the Petition Date is Michael K. Solomon.

1

5.      I am familiar with the Debtor' day-to-day operations, business affairs, and books and records.

6.      Concurrently with the filing of this affidavit, the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  The Debtor continues in the possession of its properties and the management of its business as debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  In order to enable the Debtor to operate effectively and avoid the adverse effects of the Chapter 11 filing, the Debtor has filed various types of relief in "first-day" applications and motions.

7.      I submit this affidavit in support of the Debtor's Chapter 11 petition and first-day applications in the above-captioned Chapter 11 case.  Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant first-day application or motion. Except as otherwise indicated, all facts set forth in this affidavit are based upon my personal knowledge, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtor's operations and financial condition.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.  I am authorized to submit this affidavit.

8.      Part I of this affidavit describes the Debtor's business and capital structure.  Part II describes the circumstances surrounding the filing of the Chapter 11 petition.  Part III sets forth the relevant facts in support of the Debtor's various first-day applications and motions filed concurrently herewith.

## I. <u>BACKGROUND</u>

**A.      <u>Background and Current Business Operations</u>**

9.    The Company was incorporated in 1953 as Drapery Jobbers, Inc., a manufacturer/retailer of interior finishing products sold directly to consumers in western Pennsylvania and Ohio.  This business evolved into the manufacturing of "made-to-measure" draperies with national distribution through fashion department stores across the country.  This evolution precipitated the name change to Decorator Industries, Inc. in 1960.

10.    The Company is a corporation organized and existing under the laws of Pennsylvania.

11.    In 1978, the Company's shares were listed on the American Stock Exchange, and the Company's stock began trading under the ticker symbol "DII."

12.    Today, the Company designs, manufactures and sells a broad range of interior furnishings, principally draperies, curtains, valance boards, shades, blinds, bedspreads, comforters, pillows, cushions and cubicle curtains.  These products are sold to original equipment manufacturers of recreational vehicles and manufactured housing and to the hospitality (motels/hotels) and healthcare markets either through distributors or directly to the customers.

13.    The Company has operating plants located in Haleyville, Alabama, Red Bay, Alabama, Goshen, Indiana, Bossier City, Louisiana and Abbotsford, Wisconsin.  The Company also has administrative offices in Cooper City, Florida and Hackensack, New Jersey.

14.    The Company has one industry segment and one class of products.  The business in which the Company is engaged is very competitive, and the Company competes with manufacturers located throughout the country.  The Company stands out among its competition for superior price, design and service.

15.    The chief raw materials used by the Company are largely fabrics made from both natural and man-made fibers.  The raw materials are obtained primarily from converters and mills.

The Company is not dependent upon one or a very few suppliers.  Most of its suppliers are large firms with whom, in the opinion of management, the Company enjoys good relationships.  The Company has never experienced any significant shortage in its supply of raw materials.

**B.**     **Secured Debt**

      **i.**     **Wells Fargo Bank, N.A. successor-by-merger to Wachovia Bank, National Association**

16.     In order to support its operations and to enable acquisitions, on May 24, 2006, the Company executed (i) an unsecured Loan Agreement with Wachovia Bank, N.A. ("Wachovia"); (ii) a $5,000,000.00 Revolving Promissory Note in favor of Wachovia (the "Revolving Facility"); and (iii) a $1,000,000.00 Promissory Note in favor Wachovia (the "Term Facility").  The express purpose of the Revolving Facility was for working capital, general corporate and acquisition purposes.  The purpose of the $1,000,000.00 Term Facility was to finance the Company's entity acquisition needs.

17.     The Loan Agreement was subsequently amended by that certain First Amendment to Loan Agreement dated April 25, 2008 (the "First Amendment").  Also on that date, the Company executed an Amended and Restated Promissory Note in the amount of $5,000,000.00.  The Term Facility Note was paid in its entirety.

18.     On June 26, 2009, the parties signed a letter which extended the maturity date of the Revolving Facility to September 30, 2009 (the "Extension Letter").  The Company subsequently entered into a certain Modification Agreement with Wachovia effective as of September 30, 2009, which ultimately extended the maturity date of the Company's debt obligations to Wachovia through and including December 31, 2010 (the "Second Modification").

19.     In connection with the Second Modification Agreement, the Company conveyed to

4

Wachovia certain liens and/or mortgages on the following parcels of real property owned by the Company (i) 1050 Hill Avenue, Haleyville, Alabama; (ii) 125 Hospital Road Northeast, Red Bay, Alabama; (iii) 18 Industrial Drive, Bloomsburg, Pennsylvania; (iv) 1655 Gateway Court, Elkhart, Indiana; and (v) 2927 N. 35th Avenue, Phoenix, Arizona (the "Wachovia Collateral"). A mortgage on a facility in Douglas, GA was also conveyed to Wachovia. This facility was sold in May 2010 and the proceeds of the facility were used to reduce the Company's debt to Wachovia.

20.    The Loan Agreement was subsequently amended again by that certain Second Loan Modification agreement dated January 1, 2011 (the "Third Modification") which among other things extended the maturity date to December 31, 2015.  The outstanding principle amount due as of the Third Modification was approximately $4,000,000.00..

21.    On March 20, 2010, Wachovia Bank, National Association and Wachovia Bank of Delaware, National Association merged with and into Wells Fargo Bank, N.A. , and by virtue of the merger, Wells Fargo is now the owner and holder of the Loan.

22.    In connection with the Second Modification, the Company agreed to list for sale or auction the following real properties: (i) 2927 N. 35th Avenue, Phoenix, Arizona 85017 (the "Phoenix Property") (ii) 1655 Gateway Court, Elkhart Indiana 46514 (the "Elkhart Property"); and (iii) 18 Industrial Drive, Bloomsburg, Pennsylvania 17815 (the "Bloomsburg Property")(the Phoenix, Elkhart and Bloomsburg Properties shall collectively be referred to as the "Dark Properties").

23.    The Second Modification further provides that if any of the Dark Properties have not been sold on or before December 31, 2011 (the "Dark Property Transfer Date") the Company shall transfer title to the unsold Dark Property(ies) to Wells Fargo.

5

24.     On August 18, 2011, the Phoenix Property was sold and the net sales proceeds were used to reduce the Company's debt to Wells Fargo.

25.     On September 30, 2011, the Company signed a Quit-Claim Deed transferring title to the Elkhart Property to Redus Indiana, LLC.1

26.     Wells Fargo is responsible for the payment of all obligations, including maintenance, carrying and upkeep costs associated with the Dark Properties.  Wells Fargo is entitled to receive all rental income from the Dark Properties generated after June 30, 2011.

27.     As of the Petition Date, the Company's outstanding indebtedness to Wachovia is approximately $373,33.36.

**ii.     Key Bank**

28.     In or about June 1999, the Company issued an industrial revenue bond which is guaranteed by a letter-of-credit provided by Key Bank, N.A. ("Key Bank"). The bond is payable in quarterly installments through March 2014.  The bond is secured by the Debtor's real property located at 1614 Eisenhower Dr., Goshen, Indiana.  As of the Petition Date, the outstanding indebtedness to Key Bank is approximately $385,000.00.

29.     In June 1999 Key Bank filed a UCC-1 financing statement with the Pennsylvania secretary of state, asserting as its collateral "All of Debtor's equipment, and fixtures, including, but not limited to, machinery, parts, tools fixtures, furniture and accessories wherever located in Indiana . . . ."  On June 30, 2008 Key Bank extended its letter-of-credit through March 22, 2013.

**iii.     Crestmark Bank**

30.     On April 20, 2010, the Company entered into a Loan and Security Agreement with

---

1 Redus Indiana, LLC is a direct and/or indirect subsidiary of Wells Fargo Bank, N.A.

Crestmark Bank ("Crestmark").  On that same date, the Company executed a $2,000,000.00  Line of Credit Promissory Note in favor of Crestmark (collectively, the "Crestmark Loan").

31.     The Crestmark Loan provided the Company with a line of credit borrowing base equal to the lesser of $2,000,000.00 or 85% of the Company's Eligible Accounts Receivable (as defined in the Crestmark Loan documents).

32.     In connection with the Crestmark Loan, the Company granted Crestmark a security interest in all of the Company's accounts, goods, inventory, chattel paper, instruments (including promissory notes), documents, deposit accounts, money, letter of creditor rights, and supporting obligations, including all proceeds or products of the foregoing.

33.     As of the Petition Date, the outstanding indebtedness to Crestmark  is approximately $916,020.09..

## II.     EVENTS LEADING TO CHAPTER 11 FILING

34.     As a result of the severe economic downturn over the last five  years, the Company has experienced significant declines in all of its business sectors, which ultimately resulted in the Company's declining liquidity position.

35.     Our hospitality business has seen sales decline from $17,752,000 in 2008, to $9,772,000 in 2009 and to an estimated $6,612,000 in 2010. Our hospitality sales are driven by the refurbishment of existing hotels and to a lesser extent new hotel construction. Industry research shows that capital expenditures on existing hotels have gone from $5.5 billion in 2008, to $3.3 billion in 2009 and to an estimated $2.7 billion in 2010. The pipeline of new hotel rooms under construction has gone from 612,692 rooms in 2008, to 401,090 rooms in 2009, to a current 341,041 rooms as of October 2010. To adjust to the industry declines we idled one of our two hospitality

facilities in Red Bay, AL and reduced our workforce from over 120 employees in 2008 to just over 70 today. Fortunately, the key hospitality performance metrics (average daily rate, occupancy, and revenue per available room) have been steadily improving since early 2010, suggesting that we have reached a bottom and are starting to climb out of the down cycle resulting in the reopening of Red Bay, AL..

36.    The manufactured housing business has been in a decline since its peak in 1998 when 372,843 homes were shipped. More recently they shipped 81,889 homes in 2008, 49,789 homes in 2009 and about 51,500 homes in 2010 and estimate approximately 43,000 homes shipped in 2011. The manufactured housing bubble burst in 1999 from a lending crisis similar to the current lending issues with site-built housing. Through the decline in industry shipments we have experienced the bankruptcy of several key customers including Champion Homes, Fleetwood Enterprises and many smaller companies. More recently, manufactured housing has been adversely impacted by the large numbers of residential foreclosures, a lack of credit, high unemployment and higher interest rate loans than traditional site-built homes. In 2008 we began consolidating our operations supplying the manufactured housing industry reducing it from six facilities down to only two and reducing our manufactured housing employees from almost 160 down to just over 70 today. Manufactured housing is a viable industry that supplies well-built affordable housing. We are the largest supplier of our product to the manufactured housing industry.

37.    The recreational vehicle ("RV") industry's recent peak was in 2006 when the shipped 390,500 units. More recently they shipped 236,900 units in 2008, 165,700 units in 2009 and expect to ship about 235,100 units in 2010. The decline in RV shipments is directly related to the recent economic crisis and its effect on consumer confidence, the stock market, a lack of credit and high

unemployment. In March 2009 we experienced the bankruptcy of two significant customers, Fleetwood Enterprises and Monaco Coach, as well as several smaller customers in 2008 including Pilgrim International, causing us to stop manufacturing sewn goods for the RV industry and close two of our three manufacturing facilities supplying the RV industry. This reduced our RV headcount from almost 300 employees down to only 50, working in a single location producing only pleated shades. We are a leading supplier of pleated shades to the RV industry selling to many of the leading RV manufacturers.

38.     The Company's sales peaked in 2006 with just over $52.0 million in net sales and a profit of $405,393. The net sales declined to $39.6 million in 2008 with a loss of $2.6 million and a one-time write off of $1.7 million. The net sales declined further to $18.6 million in 2009 with a loss of $3.0 million and a one-time write off of $1.4 million. The Company did  $15,469,636 million in net sales in 2010 and estimates it will do approximately $15.5 million in 2011.  The Company completed significant restructurings during the last three years reducing overheads by over $4 million largely through plant closures and reduced staffing. The Company has generated cash for operations by raising over $1.4 million through the sale-leaseback of two owned facilities in early 2009, receiving $1.2 million in tax refunds in early 2010 and through bank lending. There are certain costs the Company has been unable to address by means of negotiation that prevent the Company from generating the positive cash flow needed to become a viable entity again. Should these issues be resolved the Company will become cash flow positive and be able to sustain itself.

## III.  FACTS IN SUPPORT OF FIRST DAY MOTIONS

39.     Concurrently with the filing of this affidavit, the Debtor is filing a number of applications and motions seeking entry of orders (the "First Day Orders") which the Debtor believes

are necessary to enable it to operate in Chapter 11 with a minimum of disruption and loss of productivity. The Debtor respectfully requests that each of the First Day Orders be entered as a critical element in stabilizing and facilitating the Debtor's operations during this Chapter 11 case. A brief description of the relief requested and the facts supporting each of the First Day Orders is set forth below.

**DEBTOR'S EMERGENCY MOTION FOR ORDER (A) AUTHORIZING THE DEBTOR (1) TO USE CASH COLLATERAL ON AN INTERIM BASIS PURSUANT TO 11 U.S.C. § 363, AND (2) TO PROVIDE ADEQUATE PROTECTION IN CONNECTION THEREWITH PURSUANT TO 11 U.S.C. § 361, (B) SETTING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(b), AND (C) TERMINATING LOCKBOX ARRANGEEMNT WITH CRESTMARK BANK AND RELATED RELIEF**

40.     Any cash or cash equivalents, funds or proceeds of or derived from certain of the collateral securing the obligations of the Debtor to Crestmark under the Crestmark Loan may constitute cash collateral within the meaning of Section 363 of the Bankruptcy Code (the "Cash Collateral").

41.     By this Motion, the Debtor seeks the entry of an interim order (the "Interim Order") authorizing, on an emergency and limited basis, the use of Cash Collateral in accordance with the Budget attached to the Motion as Exhibit "A" and termination of the Lockbox Arrangement. The filing of this Motion does not constitute an admission by the Debtor that Crestmark holds valid liens on the Debtor's cash or cash equivalents or any other assets. The Debtor reserves the right to contest the validity, priority and extent of the alleged liens and alleged claims of Crestmark.

42.     A critical need exists for the Debtor to be permitted access to Cash Collateral in order to continue to operate its business, maintain hundreds of jobs and preserve its ongoing, enterprise

value.  Among other things, the entry of an Interim Order, is in the best interests of the Debtor, its creditors and its estate because it will enable the Debtor to (i) continue the orderly operation of its business and avoid a shutdown of operations; (ii) meet its obligations for payroll, necessary ordinary course expenditures, and other operating expenses; (iii) make payments authorized under other Orders entered by this Court; (iv) obtain needed goods and services; (v) retain customer, supplier and employer confidence by demonstrating that the Company has the financial ability to maintain normal operations; and (vi) maintain adequate cash resources customary and necessary for companies of this size and in the industries in which they operate to maintain customer confidence and employee loyalty, thereby avoiding immediate and irreparable harm to the Debtor's estate.

43.    The Debtor requests that the Replacement Lien and administrative expense claims granted to the Lender pursuant to the terms of the Interim Order be at all times subject and junior to: (i) all unpaid compensation and reimbursement of expenses of professionals (including any unpaid holdback amounts) employed by the Debtor's estate by order of the Court (the "Professionals") accrued or incurred on or before the earlier of entry of an order terminating the Debtor's use of cash collateral (the "Termination Date") that are allowed and payable under 11 U.S.C. §§330 and 331 and/or any orders of the Court, regardless of whether allowed before such Termination Date; (b) compensation and reimbursement of expenses of Professionals accrued or incurred after the Termination Date in connection with the wind-down of the Chapter 11 case and conversion to chapter 7 case, if the case is converted to chapter 7 case either voluntarily or involuntarily, (c) all unpaid fees due to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930; and (d) all unpaid fees required to be paid to the Clerk of the Bankruptcy Court (collectively, the "Carve Out").

44.    Supplemental to the replacement liens provided to Crestmark, the Debtor will furnish

11

Crestmark with such financial and other information as required by the Loan Documents or other reports as Crestmark reasonably requests.

45.    In addition, the Crestmark asserts that it is secured by, among other things, the Debtor's accounts receivable which are remitted by the Debtor's customers directly into a dedicated lockbox account at Crestmark (the "Lockbox Account"). The amounts in the Lockbox Account are swept daily by Crestmark and utilized to reduce and pay down the revolving portion of the Loan, thus increasing the Company's availability for borrowing under the Loan in accordance with a certain borrowing base formula set forth in the Loan Agreement (the "Advance Formula"). I have been advised that upon the filing of the Debtor's bankruptcy, the Lockbox Account to which the Debtor's customers remit their payments may become "blocked" and the Debtor will not have access to any advances under the Loan. Without the relief requested by the Debtor in this Motion in respect of the use of Cash Collateral, free of the restrictions of the Lockbox Account and free of the requirements under the Advance Formula, the Debtor will not have access to any Cash Collateral in order to preserve their businesses or pay their ordinary and necessary operating expenses. Specifically, as part of the relief requested herein, the Debtor requests that all monies on deposit in the Lockbox Account as of the filing of the Chapter 11 case, as well as all funds thereafter deposited into the Lockbox Account, be made available for use by the Debtor in its operations pursuant to the relief requested in this Motion and in accordance with the Budget and the other provisions of the Interim Order. The Debtor further requests that the use of Cash Collateral be free of the restrictions imposed on the Lockbox Account in accordance with the Loan Documents, including compliance with the Advance Formula, and that the Lender be prohibited from blocking the Debtor's access to such funds, including within the scope of the Budget and the Interim Order.

46.     The replacement lien granted to Crestmark in connection with the use of the Cash Collateral shall be valid and perfected without the need for the execution or filing of any further documents or instruments.

47.     I believe that use of Cash Collateral pursuant to the terms and conditions set forth above is fair and reasonable and adequately protects Crestmark by virtue of the combination of: (i) the Debtor's ability to preserve the going concern value of the business with the use of Cash Collateral; (ii) the post-petition Replacement Lien granted to Crestmark; (iii) the super-priority administrative expenses proposed in the Motion, and (iv) providing Crestmark with the other protections set forth in the Motion, including the availability of financial reporting.

48.     For all of the reasons stated above, this Court's approval of the Debtor's use of Crestmark's Cash Collateral is proper as set forth in the Motion.

**DEBTOR'S EMERGENCY MOTION FOR THE ENTRY OF AN ORDER (I) AUTHORIZING THE PAYMENT OF PRE-PETITION WAGES, SALARIES, COMMISSIONS AND EMPLOYEE BENEFITS (II) AUTHORIZING THE DEBTOR TO CONTINUE THE MAINTENANCE OF EMPLOYEE PRACTICES AND BENEFIT PLANS AND PROGRAMS IN THE ORDINARY COURSE AND (III) DIRECTING ALL BANKS TO HONOR PRE-PETITION CHECKS FOR PAYMENT OF PRE-PETITION EMPLOYEE OBLIGATIONS**

49.     As of the Petition Date, the Debtor employed approximately 200 full and part time Employees, including management, operations, customer service, sales, manufacturing and financial personnel.

50.     By this Motion, the Debtor requests that this Court enter an Order pursuant to Sections 105(a) and 507(a)(4) and (5) of the Bankruptcy Code authorizing the Debtor to: (a) pay the various pre-petition wages, salaries, commissions and employee benefits of the Debtor's employees (the "Employees"); and (b) continue the Debtor's various pre-petition employee practices and benefit

plans as described below (collectively, the "Pre-petition Employee Obligations").

51.     As part of the foregoing relief, the Debtor also seeks authorization to pay all federal and state withholding and payroll-related taxes relating to pre-petition periods including, but not limited to, all withholding taxes, Social Security taxes, and Medicare taxes, as well as all other withholdings such as life insurance, child support payments, Chapter 13 plan payments and other employee deductions, if any.

52.     Finally, the Debtor requests entry of an order: (a) directing all banks to honor the Debtor's pre-petition checks for payment of the Pre-petition Employee Obligations; and (b) prohibiting banks from placing any holds on, or attempting to reverse, any automatic transfers to Employees' accounts for Pre-petition Employee Obligations.

53.     In the ordinary course of its business, and as is customary in the Debtor's industry, the Debtor offer their employees various benefits, including medical, dental and life insurance, vacation pay, and other similar such benefits.   The Debtor request authorization to honor all employee reimbursement requests in respect of pre-petition business related expenses incurred, in the manner consistent with its pre-petition practices.  I believe it would be inequitable and cause an undue hardship if those employees were required to bear those expenses incurred on behalf of the Debtor.

54.     I believe that the payment to the Debtor's employees of pre-petition employee obligations in accordance with its pre-petition business practices is in the best interests of the estate, creditors, and interest holders and will enable the Debtor to continue to operate its businesses in an efficient manner without disruption.  These payments and the continuation of benefit programs will be crucial to the well being of the Debtor's employees, who are vital to the ongoing businesses and

to maximizing recovery for the Debtor's creditors.

### EMERGENCY MOTION OF THE DEBTOR-IN-POSSESSION FOR INTERIM AND FINAL ORDERS DETERMINING ADEQUATE ASSURANCE OF PAYMENT FOR FUTURE UTILITY SERVICES

55.     Section 366(a) of the Bankruptcy Code prevents utility companies from discontinuing, altering or refusing service to a debtor during the first 20 days of a bankruptcy case. However, thirty (30) days from the Petition Date, a utility company has the option of terminating its services, pursuant to Section 366(c)(2) of the Bankruptcy Code, if a debtor has not furnished adequate assurance of payment.

56.     By this Motion, the Debtor seeks entry of an Order: (i) determining that the Utility Providers (as defined below) have been provided with adequate assurance of payment within the meaning of Section 366 of the Bankruptcy Code; (ii) approving the Debtor's proposed offer of adequate assurance and procedures whereby Utility Providers may request additional or different adequate assurance; (iii) prohibiting the Utility Providers from altering, refusing or discontinuing services on account of prepetition amounts outstanding or on account of any perceived inadequacy of the Debtor's proposed adequate assurance; (iv) establishing procedures for the Utility Providers to seek to opt out of the Debtor's proposed adequate assurance procedures; (v) determining that the Debtor is not required to provide any additional adequate assurance beyond what it proposed by this Motion, pending entry of the Final Order; and (vi) setting a final hearing (the "Final Hearing") on the Debtor's proposed adequate assurance.

57.     Uninterrupted utility services are essential to ongoing operations and, therefore, to the success of this Chapter 11 case. Should the Utility Providers refuse or discontinue service, even for a brief period, the Debtor's business operations would be severely disrupted. The impact on the

15

Debtor's business operations, revenue and profits would be extremely harmful and would jeopardize the Debtor's restructuring efforts.  It is therefore critical that utility services continue uninterrupted.

58.    I submit that granting the relief requested is both necessary and appropriate, and that, based on the facts of this case, no deposits should be required in addition to the Proposed Adequate Assurance.  Such relief will help the Debtor to successfully restructure and thus fulfill the purposes of Section 105 of the Bankruptcy Code and will not prejudice the rights of the Utility Providers under Section 366 of the Bankruptcy Code.

## DEBTOR'S EMERGENCY MOTION FOR (1) AUTHORITY TO CONTINUE USE OF EXISTING BUSINESS FORMS AND RECORDS; (2) AUTHORITY TO MAINTAIN EXISTING CORPORATE BANK ACCOUNTS AND CASH MANAGEMENT SYSTEM; AND (3) EXTENSION OF TIME TO COMPLY WITH 11 U.S.C. § 345 INVESTMENT GUIDELINES

59.    I understand that the Office of the United States Trustee has established certain operating guidelines for Debtor-in-possession in order to supervise the administration of Chapter 11 cases. These guidelines require a Chapter 11 Debtor to, among other things, close all existing bank accounts and open new debtor-in-possession ("DIP") bank accounts, establish one DIP account for all estate monies required for the payment of taxes (including payroll taxes), maintain a separate DIP account for cash collateral, and obtain checks for all DIP accounts that bear the designation, "debtor-in-possession," the bankruptcy case number, and the type of account. The Debtor seeks a waiver of these requirements.

60.    I am also advised that section 345 of the Bankruptcy Code establishes certain requirements with respect to all deposits and investments of money of the estate. The Debtor seeks a 45 day extension of time to comply with the requirements of section 345 or to request a waiver of such requirements.

61.     The Debtor seeks a waiver of the requirement that they open a new set of books and records as of the Petition Date because the Debtor respectfully submits that opening a new set of books and records would create unnecessary administrative burdens and would cause unnecessary expense, utilization of resources, and delay. With the use of computer technology, it will be easy to differentiate between pre- and post-petition transactions by date.

62.     In the ordinary course of its business, the Debtor uses many checks, invoices, stationery, and other business forms. By virtue of the nature and scope of the business in which the Debtor is engaged, and the numerous other parties with whom the Debtor deals, the Debtor needs to be permitted to use its existing business forms without alteration or change. A substantial amount of time and expense would be required in order to print new checks and other business forms. Fulfillment of the requirement would likely delay payment of post-petition claims and negatively affect operations. Accordingly, the Debtor respectfully requests that it be authorized to continue to use their existing business forms and to maintain their existing business records.

63.     The Debtor respectfully requests authority to maintain its existing bank accounts (each a "Bank Account" or "Account" and collectively, the "Bank Accounts" or "Accounts") and cash management systems (each a "Cash Management System" and collectively, the "Cash Management Systems") in accordance with its usual and customary practices to ensure a smooth transition into chapter 11 with minimal disruption to operations and its ability to reorganize.

64.     The Debtor also requests authority to close any of the Bank Accounts if, in the exercise of its business judgment, the Debtor determines that such action is in the best interest of its estate.

65.     Only if the Bank Accounts are continued with the same account numbers, at least on

17

an interim basis, can the transition into Chapter 11 be smooth and orderly, with minimal interference with continuing operations. To conduct its post-petition businesses, and to facilitate reorganization, the Debtor needs to be able to issue checks to vendors, service providers, employees, and others. To open new accounts and obtain checks for those accounts will cause delay and disruption to the Debtor's business. Moreover, as discussed above, a change in the Accounts to which customers wire and route payments could delay the Debtor's receipt of funds needed for continued operations and reorganization. By preserving business continuity and avoiding operational and administrative paralysis that closing the existing Bank Accounts and opening new ones would necessarily create, all parties-in-interest, including employees, vendors, and customers, will be best served, and the benefit to the Debtor's estates will be considerable. The confusion that would otherwise result could only work to the detriment of this Chapter 11 case. (Of course, no checks issued prior to the Petition Date are to be honored, except as otherwise provided by separate order of this Court.)

66.    The Debtor will continue to maintain records respecting all transfers between and among the Bank Accounts so that all transactions can be ascertained after they have occurred. In addition, the Debtor will instruct its banks to add the designation, "Debtor-in-Possession" or "DIP" to their current and any future domestic Accounts with each such bank, will treat the Accounts for all purposes as Accounts of the Debtor as DIP, and will maintain records that recognize the distinction between pre-petition and post-petition transfers. The Debtor believes that its current cash and investments are relatively safe because the Debtor's financial institutions are, upon information and belief, financially stable.

67.    The Debtor believes that its banks are authorized depositories. Due to the significant amounts of money that may be in the Bank Accounts from time to time, it would take some time for

18

the Debtor to locate and determine, where necessary, appropriate alternative accounts that satisfy section 345(b). Therefore, Debtor seeks a reasonable extension of time to meet the requirements of section 345(b).

**EMERGENCY MOTION FOR AN ORDER PURSUANT TO SECTIONS 105(a), 363(c) AND 503(b) OF THE BANKRUPTCY CODE GRANTING ADMINISTRATIVE EXPENSE STATUS TO DEBTOR'S OBLIGATIONS TO VENDORS ARISING FROM POSTPETITION DELIVERY OF MERCHANDISE ORDERED PREPETITION AND AUTHORIZING THE DEBTOR TO PAY SUCH EXPENSES IN THE ORDINARY COURSE OF BUSINESS**

68.     In the ordinary operation of the business of the Debtor, numerous vendors provide the Debtor's manufacturing facilities with hundreds of thousands of dollars of inventory and raw materials on a monthly basis.  As of the Petition Date and in the ordinary course of its business, the Debtor had numerous pre-petition purchase orders outstanding (the "Outstanding Orders") with various vendors (the "Vendors") for merchandise.  However, many of the Vendors have voiced concern about the financial well being of the Debtor and may be concerned that shipments of goods made after the Petition Date pursuant to a pre-petition purchase order will render a vendor who makes such shipment a general unsecured creditor of the Debtor's estate.

69.     Accordingly, there is a risk that Vendors may not ship goods to the Debtor until they issue substitute purchase orders post-petition or obtain an order of this Court deeming all obligations of the Debtor arising from post-petition shipments of merchandise to be granted administrative expense status to be paid by the Debtor pursuant to section 503(b)(1)(A) of the Bankruptcy Code.

70.     By this Motion, the Debtor seeks entry of an order granting the Vendors administrative expense priority status under section 503(b) of the Bankruptcy Code for those undisputed obligations arising from shipments of merchandise received and accepted by the Debtor subsequent to the Petition Date in respect of the Outstanding Orders (the "Vendor Obligations").  In

addition, in order to provide the Vendors with further comfort and out of an abundance of caution, the Debtor seeks authorization to pay, in the ordinary course of its business pursuant to section 363(c) of the Bankruptcy Code, the undisputed obligations arising from the post-petition shipment of merchandise by the Vendors and acceptance thereof by the Debtor.

71.     I believe that the relief requested herein will ensure the continuous supply of inventory, which is vital to the Debtor's continuing operations and integral to its successful reorganization.  Absent such relief, the Debtor may be required to expend substantial time and resources to reissue the Outstanding Orders.  The attendant disruption to the continuous flow of inventory to the Debtor's manufacturing facilities would likely result in disruption of order completion.  Such a result would lower customer confidence in the Debtor at a critical juncture and could jeopardize the Debtor's opportunity to achieve a successful reorganization.

**EMERGENCY MOTION FOR ENTRY OF AN ORDER ESTABLISHING PROCEDURES FOR ADDRESSING RECLAMATION CLAIMS PURSUANT TO 11 U.S.C. § 546(c)**

72.     The Debtor seeks to adopt a set of exclusive procedures for the reconciliation and treatment of all asserted reclamation demands (the "Demands") to avoid piecemeal litigation that would interfere with Debtor's bankruptcy proceedings. It is of paramount importance for the Debtor to avoid costly and distracting litigation relating to Demands. If the Debtor is unable to establish and implement uniform procedures for Demands, it will be faced with the prospect of simultaneously defending multiple reclamation adversary proceedings at a time when the Debtor needs to focus on critical aspects of its reorganization efforts.

73.     The Debtor believes that its ability to resolve Demands in this uniform manner will assist in the consensual resolution of such claims and, ultimately, the maximization of value for the

Debtor, its estate, and its creditors. Moreover, section 546(h) of the Bankruptcy Code clearly provides authority for the Debtor to return Goods that are subject to reclamation. Therefore, it is in the best interests of the Debtor and its estate and creditors to implement the Reclamation Procedures.

**EXPEDITED MOTION FOR AN ORDER PURSUANT TO
11 U.S.C. §§ 105(a), 541, AND 507(a)(8) AUTHORIZING THE
DEBTOR TO PAY PRE-PETITION PROPERTY
<u>AND OTHER TAXES AND RELATED OBLIGATIONS</u>**

74.    By this Motion, the Debtor requests entry of an order pursuant to Sections 105(a), 541, and 507(a)(8) of the Bankruptcy Code authorizing it to pay pre-petition sales, use, and other similar "trust fund" taxes (the "Taxes") and similar obligations detailed herein to various state and local taxing authorities (collectively, the "Taxing Authorities") in the ordinary course of the Debtor's business.  Such relief will be without prejudice to the Debtor's rights to contest the amounts of any Taxes on any grounds it deems appropriate.

75.    The Debtor, in the ordinary course of its business, incurs various Taxes, including state and local sales and use tax, tangible and intangible personal property taxes and real property taxes.  Sales and use taxes, at both the state and local level, accrue as the Debtor sells products and are calculated based upon statutorily mandated percentages of the price at which the Debtor's products are sold.  The Debtor seeks authority to pay those Taxes that have accrued but were not remitted to the Taxing Authorities prior to the Petition Date.

76.    The Taxing Authorities require the Debtor to remit estimated sales and use taxes and similar collections on a periodic basis during the month in which sales are made.  The Taxing Authorities then "true up" any deficiency or surplus on the date on which the taxes are actually due. Prior to the Petition Date, the Debtor was current on its obligations with respect to these Taxes.

77.     The Debtor estimates that its aggregate pre-petition tax liabilities to the various Taxing Authorities are approximately $7,000.00 for sales and use taxes.  The Debtor therefore requests relief to pay such portion of the Taxes due to the Taxing Authorities that represents pre-petition taxes in the ordinary course of the Debtor's business.

**EMERGENCY APPLICATION OF DEBTOR-IN-POSSESSION FOR EMPLOYMENT *NUNC PRO TUNC* OF PAUL J. BATTISTA AND THE LAW FIRM OF GENOVESE JOBLOVE & BATTISTA, P.A., AS GENERAL BANKRUPTCY COUNSEL FOR <u>DEBTOR-IN-POSSESSION, AND REQUEST FOR INTERIM RELIEF</u>**

78.     By this Application, the Debtor seeks to employ and retain Paul J. Battista, Esq. and the law firm of GJB as its general restructuring and bankruptcy counsel with regard to the filing of its Chapter 11 petition and the prosecution of its Chapter 11 case.  Accordingly, the Debtor respectfully requests the entry of an interim order on an emergency basis pursuant to Section 327(a) of the Bankruptcy Code, followed by the entry of a final order to be entered at a hearing to be held twenty (20) days later, authorizing it to employ and retain Paul J. Battista, Esq. and the law firm of GJB as its general bankruptcy counsel under a general retainer to perform the legal services that will be necessary during its Chapter 11 case as more fully described below.

79.     Prior to the commencement of this Chapter 11 case, the Debtor sought the services of GJB principally with respect to advice regarding restructuring matters in general, and the preparation for and potential commencement and prosecution of a Chapter 11 case for the Debtor.  The Debtor believes that the continued representation by its pre-petition restructuring counsel, GJB, is critical to the Debtor's efforts to restructure its business because GJB has extensive experience and expertise in complex commercial reorganization case and has become very familiar with the Debtor's business, legal and financial affairs.  Accordingly, GJB is well-suited to guide the Debtor through the Chapter 11 process.

80.    Continued representation of the Debtor by its restructuring counsel, GJB, is critical to the success of the Debtor's reorganization efforts because GJB is and has become very familiar with the Debtor's business, financial and legal affairs.

81.    The Debtor has selected the firm of GJB as its attorneys because of GJB's experience with and knowledge of the Debtor and its business, as well as its extensive experience, knowledge and expertise in the field of Debtor and creditors' rights and business reorganizations under Chapter 11 of the Bankruptcy Code.

82.    The Debtor desires to employ the firm of GJB under a general retainer because of the extensive legal services that will be required in connection with its Chapter 11 case and the firm's familiarity with the business of the Debtor.

83.    Except as set forth in the Battista Affidavit attached to the Application, to the best of the Debtor's knowledge, the shareholders, counsel and associates of GJB: (a) do not have any connection with the Debtor, its affiliates, its creditors, the U.S. Trustee, any person employed in the office of the U.S. Trustee, or any other party in interest, or its respective attorneys and accountants; (b) are "disinterested persons," as that term is defined in Section 101(14) of the Bankruptcy Code; and (c) do not hold or represent any interest adverse to the Debtor's estate.

**MOTION FOR AN ADMINISTRATIVE ORDER PURSUANT TO 11 U.S.C. §§ 105(a) AND 331 ESTABLISHING PROCEDURES FOR INTERIM COMPENSATION AND REIMBURSEMENT OF EXPENSES OF PROFESSIONALS**

84.    By this Motion, the Debtor requests the entry of an order authorizing and establishing procedures for the compensation and reimbursement of expenses to court-approved professionals (the "Professionals") on a monthly basis. Such an order will streamline the professional compensation process and enable the Court and all other parties to monitor the professional fees and

expenses incurred in this Chapter 11 case more effectively.

85.     The procedures suggested in this Motion will enable the Debtor to closely monitor the costs of administration, maintain a level cash flow, and implement efficient cash management procedures.  Moreover, these procedures will also allow the Court and the key parties in interest to insure the reasonableness and necessity of the compensation and reimbursement sought pursuant to such procedures.

### EXPEDITED MOTION FOR AN ORDER PURSUANT TO BANKRUPTCY RULE 1007(c) GRANTING AN EXTENSION OF TIME TO FILE STATEMENT OF FINANCIAL AFFAIRS AND SCHEDULES OF ASSETS AND LIABILITIES

86.     Under Bankruptcy Rule 1007(c), the Debtor is required to file its Statements and Schedules within fourteen (14) days after the Petition Date. To prepare the Statements and Schedules, the Debtor must gather information from books, records, and documents relating to thousands of transactions.  The collection of the information necessary to complete the Statements and Schedules will require an expenditure of substantial time and effort on the part of the Debtor's employees.

87.     In the days and weeks leading up to the filing of these Chapter 11 Cases, the Debtor's key management has been entirely occupied in pursuing strategic alternatives, negotiating agreements to assist in the Debtor's reorganization and preparing information and documents necessary to prepare the Debtor's chapter 11 filings. In the early days of this case, the Debtor anticipates that its key management and other employees will have many competing demands assisting in efforts to implement the Debtor's restructuring efforts while also addressing myriad employee, customer, and vendor issues.  Under these circumstances, it appears unlikely that the Debtor will be able to complete its Statements and Schedules properly and accurately by the

ordinary fifteen-day deadline.

88.     Accordingly, the Debtor requests that the Court extend the period under Bankruptcy Rule 1007(c) for an additional fourteen (14) days, thereby setting the deadline to file the Statement and Schedules to twenty-eight (28) days after the Petition Date.

**EMERGENCY MOTION FOR AN ORDER PURSUANT TO
11 U.S.C. §§ 105(a), 365 AND 507(a)(7) AUTHORIZING THE DEBTOR
TO HONOR CUSTOMER SATISFACTION PROGRAMS AND TO CONTINUE
<u>CERTAIN CUSTOMER PRACTICES</u>**

89.     By this Motion, the Debtor seeks the entry of an order allowing the Debtor to honor all pre-petition practices and obligations owed to customers on account of, without limitation, warranties, customer repairs, special orders, deposits, overpayments, returns, refunds, exchanges, rebates, adjustments, and account credits (the "Customer Satisfaction Programs") thereby ensuring and maintaining customer satisfaction and loyalty without interruption throughout the duration of this Chapter 11 case.

90.     Further, the Debtor requests that it be authorized to continue certain customer practices (the "Customer Practices"), which Customer Practices include, without limitation, fulfilling special orders, accepting credit cards and honoring its return policy for its non-custom or non-special order merchandise.

91.     Prior to the Petition Date, in the ordinary course of its business, the Debtor provided its customers with certain benefits in the form of the Customer Satisfaction Programs, and as a result thereof, received from customers, without limitation, deposits, overpayments, partial payments, or pre-payments related to sales of goods and services (including services related to warranty protections) that the Debtor has not yet delivered, provided (in full or in part), or obtained from third

25

parties.

92.     There also exist contingent pre-bankruptcy claims against the Debtor held by customers for rebates, refunds, returns, exchanges, adjustments (including adjustments to billing) and other credit balances relating to goods sold or services rendered to customers in the ordinary course of business prior to the Petition Date.

93.     Finally, the Debtor is a party to certain agreements with credit card companies and processors (the "Customer Service Providers") pursuant to which the Debtor is able to accept credit card purchases, subject to certain adjustments, returns and refunds.  The Debtor's continued ability to honor and process credit card transactions is essential to the Debtor's efforts in this Chapter 11 case and continued customer loyalty.  Without this ability, the Debtor would lose a major avenue for conducting sales transactions in the ordinary course of its operations.  Under the terms of its agreements, the Debtor is required to pay the Customer Service Providers fees for their services, certain amounts of which may have accrued but remain unpaid as of the Petition Date.  The Debtor requests to continue to pay these fees in the ordinary course of its business in order to avoid interruption of these vital credit card processing services.  As of the Petition Date, the Debtor estimates that approximately $1,000.00 in pre-petition fees is owed to Customer Service Providers. Fees to the Customer Service Providers are drawn from the Debtor's bank account electronically.

94.     The success and viability of the Debtor's business, and ultimately the Debtor's ability to maximize value for creditors and/or successfully reorganize, are totally dependent upon the patronage and loyalty of its customers.  In this regard, the Debtor's Customer Satisfaction Programs are critical, and any delay in honoring the Debtor's obligations thereunder will severely and irreparably impair customer relations.  Additionally, any failure to honor pre-petition obligations to

Customer Service Providers, for even a brief time, might well drive away valuable customers, thereby irreparably harming the Debtor's ability to maximize value for creditors.

95.     Accordingly, the Debtor seeks Court authority to continue the Customer Satisfaction Programs, including authority to honor pre-petition claims arising therefrom, and to pay pre-petition obligations owed to its Customer Service Providers.

96.     This concludes my declaration.

Pursuant to 28 U.S.C. § 1746, I, William A. Johnson, declare under penalty of perjury that the foregoing is true and correct.


William A. Johnson, President and
Chief Executive Officer